**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 12-795 (MAS) |
| | : | |
| TONY F. MACK and RALPHIEL MACK, | : | **MEMORANDUM OPINION** |
| | : | |
| Defendants. | : | |
| | : | |

**SHIPP, District Judge**

Tony Mack, the former Mayor of Trenton, and his brother, Ralphiel Mack, stood trial on charges of conspiracy to commit extortion, attempted extortion, bribery, mail fraud, and wire fraud. The jury convicted Tony Mack on all counts; it acquitted Ralphiel Mack of the mail and wire fraud charges. Both Defendants now move for a judgment of acquittal, or, in the alternative, for a new trial, under Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. The Court has carefully considered the parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1.

**I.    Background**

Tony Mack was elected to the Trenton mayoralty in June 2010. Three months later, he was the target of an elaborate FBI sting operation involving a fictitious plan to erect an automated parking garage on city-owned property on East State Street in Trenton. Posing as agents for a development firm, FBI cooperators Lemuel Blackburn and Harry Seymour sought to buy Tony Mack's official backing for the project. Over the course of a 21-month-long undercover investigation, Blackburn and Seymour delivered payments totaling $54,000 to Joseph

Giorgianni, a restaurateur, reputed loan shark, and convicted drug peddler, who purported to act on behalf of Tony Mack in the scheme.

At trial, the Government relied heavily on consensual recordings of the FBI operatives' numerous conversations with Giorgianni; calls and text messages intercepted through wiretaps on cellphones used by Giorgianni, Tony Mack, and Charles Hall; and video footage from an FBI-installed surveillance camera outside Jojo's Steakhouse, the restaurant that served as Giorgianni's base of operations. The Government also presented live testimony from a half dozen witnesses, two of whom, Charles Hall and Mary Manfredo, testified pursuant to cooperation agreements. Although Giorgianni had entered into a cooperation agreement on the eve of trial, the Government did not call him to the stand.

Ultimately the trial's outcome turned on two hotly disputed issues: whether Tony Mack was party to Giorgianni's agreement with Blackburn and Seymour, and, if so, whether Ralphiel Mack was a witting participant in the scheme. The Court will briefly summarize the evidence supporting the jury's determination as to each of these issues.

## A.   The Case Against Tony Mack

At trial, the Government devoted substantial energy to establishing a "pattern" involving Giorgianni's use of the code word "Uncle Remus" in phone calls and text messages with Tony Mack.[1] Charles Hall, a cooperating witness who served as Giorgianni's right hand man in the parking garage scheme and other criminal endeavors, testified that Giorgianni used the phrase as a code word for "cash money."[2] Hall's account was consistent with evidence pulled from the wiretaps on Giorgianni and Tony Mack's phones: Giorgianni usually mentioned "Uncle Remus"

---

[1]  (1/13/14 Tr. 102-03; 1/14/14 Tr. 47-48; 2/4/14 Tr. 152-54, 159.)

[2]  (1/17/14 Tr. 77, 82.)

2

soon after he had received payments connected to the parking garage scheme. There was, moreover, some evidence that suggested the phrase triggered Ralphiel Mack's visits to Jojo's Steakhouse.[3] Thus, the Government argued, "Uncle Remus" linked Tony Mack to the cash Giorgianni accepted in connection with the scheme.[4]

Although the evidence related to "Uncle Remus" suggested a corrupt relationship between Giorgianni and Tony Mack, it provided marginal support for an inference that Tony Mack entered into a corrupt agreement *vis-à-vis* the parking garage scheme. Hall's testimony established that "Uncle Remus" meant cash in general, as opposed to cash related to one particular endeavor. In any case, Mack's apparent comprehension of the phrase evidenced awareness of, but not necessarily participation in, the parking garage scheme.

It was Mary Manfredo's testimony that proved Tony Mack's complicity. Manfredo ran Jojo's Steakhouse, prepared Giorgianni's breakfast every morning, helped him get dressed, and handled his finances.[5] She also participated in his oxycodone distribution ring.[6] Testifying pursuant to a cooperation agreement related to the drug charges, Manfredo claimed to have witnessed Giorgianni pass a wad of money to Tony Mack during a brief encounter in the kitchen of Jojo's Steakhouse on April 17, 2012.[7] Manfredo testified that although Giorgianni did not

---

[3] (Govt. Exhs. 1091-T, 208A-H.)

[4] (2/4/14 Tr. 89.)

[5] (1/24/14 Tr. 71, 82-84, 92-95.)

[6] (*Id.* at 186-87.)

[7] (*Id.* at 116-17, 121; 1/28/14 Tr. 59.)

explain the purpose of the payoff to her, she assumed the cash had come from one of the white envelopes Blackburn delivered to Giorgianni on April 12.[8]

The significance of Manfredo's testimony lay in events that immediately followed Mack's visit to the Steakhouse on April 17. In a phone call intercepted minutes after Mack left the Steakhouse, Giorgianni and Blackburn arranged for Mack to meet face-to-face with Seymour in Atlantic City the following week.[9] Immediately after he had finished with Blackburn, Giorgianni relayed the plans to Mack, saying "what-cha-call-it made, uh, he just called me. . . . They'll have dinner with us on Wednesday."[10] On Wednesday April 25, Mack met Seymour in a restaurant at the Borgata Casino in Atlantic City.[11]

Thus, Manfredo's testimony provided the groundwork for a highly incriminating inference: Mack met with Seymour on April 25 because he had received bribe money connected to the project the week before. With this precedent established, the jury could have easily concluded that bribe payments motivated Tony Mack's subsequent decision to approve the sale of the East State Street property to Seymour Builders. The evidence against Tony Mack also paved the way for the jury's determination that Ralphiel Mack joined with his brother, Giorgianni, and Hall in the conspiracy.

### B.    Evidence Against Raphiel Mack

The Government contended that Ralphiel Mack served as an intermediary between Giorgianni and Mack. This theory found support in the testimony of Charles Hall, who described

---

[8] (*Id.* at 130-31; *see* 1/13/14 Tr. 33-34; Govt. Exh. 1069-T.)

[9] (Govt. Exh. 1075-T.)

[10] (Govt. Exh. 1076-T.)

[11] (Govt. Exh. 1090-T.)

4

Ralphiel as a "buffer" or "[g]o-between, between Tony and Jojo, and myself," and Giorgianni's statement that he "kep[t] Tony safe" by channeling bribe money through Ralphiel.[12]

The Government also highlighted a rough correlation between developments in the parking garage scheme and Ralphiel Mack's visits to Jojo's Steakhouse. For instance, Ralphiel's November 18, 2011 visit to the Steakhouse came just days after Giorgianni's unrecorded conversation with Tony Mack at Harrah's Casino.[13] Similarly, in a telephone call intercepted on April 30, 2012, Giorgianni informed Tony Mack that "Uncle Remus, y'know, stopped by" – apparently a cryptic reference to the $3,000 payment Giorgianni received from Seymour on April 25.[14] On May 1, Ralphiel was observed leaving the steakhouse.[15] The events leading up to Ralphiel's June 19 visit to Jojo's followed a similar pattern.[16]

Further evidence of Ralphiel's involvement in the scheme came from Mary Manfredo, who claimed to have seen Giorgianni hand money to Ralphiel at the Steakhouse on July 16, 2012.[17] According to Manfredo, Giorgianni informed her that the money, $2,500, was for Tony

---

[12] (1/17/14 Tr. 59; 1/24/14 Tr. 49; Govt. Exh. 1122-T.)

[13] (1/17/14 Tr. 13-16; Govt. Exh. 1031.) A few days after Ralphiel's visit, Giorgianni suggested that Blackburn meet preliminarily with Ralphiel about the parking garage scheme. (Govt. Exh. 1033-T.) There is no evidence that this meeting occurred.

[14] (1/13/12 Tr. 68-69; Govt. Exhs. 1090-T, 1091-T.)

[15] (Govt. Exh. 2015-B.)

[16] (1/14/12 Tr. 17-20.)

[17] (1/24/14 Tr. 143-44.)

Mack.[18] A search of Ralphiel's house on July 18 uncovered $2,500 in marked bills in the pocket of Ralphiel's trousers.[19]

Three incidents provided evidence of Ralphiel's guilty conscience. First, there was his awkward telephone conversation with Hall several hours after he left Jojo's steakhouse on May 1, 2012. Following a brief discussion of unrelated matters, Hall asked Ralphiel whether he "stop[ped] by, and [got] a cheesesteak."[20] Ralphiel paused, then replied "Yeah. Yeah. I got a steak."[21] In his testimony at trial, Hall explained that "cheesesteak" referred to "money."[22] Second, involved Ralphiel's allegedly evasive driving maneuvers following his July 16 visit to the Steakhouse. Special Agent Doyle testified that Ralphiel had executed an abrupt right-hand turn, which, based on the Agent's experience in "counter surveillance," suggested an attempt to foil the FBI's surveillance.[23] The third incident occurred on the morning following the search of Ralphiel's house. According to Hall, Ralphiel said that he hoped Giorgianni had "switched" the money so that the bills found in Ralphiel's possession were "clean."[24]

## II.   Defendants' Rule 29 Motions

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. The defendant seeking relief under Rule 29 bears "a very heavy burden." *United*

---

[18] (1/27/14 Tr. 60-61.)

[19] (1//29/14 Tr. 169-72.)

[20] (Govt. Exh. 1093-T.)

[21] (*Id.*)

[22] (1/17/14 Tr. 62.)

[23] (1/14/14 Tr. 55-60.)

[24] ( Tr. 1/17/14 Tr. 127.)

*States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). The court must view the totality of the evidence, resolving competing inferences and credibility issues in the prosecution's favor. *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001); *see United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992) (court "must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences"). If "any rational trier of fact could have found proof of guilt beyond a reasonable doubt," Rule 29 relief must be denied. *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008).

### A.    Tony Mack's Motion

Tony Mack asserts that his Hobbs Act and federal bribery convictions are unsustainable in the absence of proof that he undertook (or agreed to undertake) a "specific official act[]" in exchange for bribe money. (T. Mack Ltr. Br., ECF No. 183, 20-21.) While Mack acknowledges evidence "that [he] approved the Government's $100,000 offer letter," he contends that this act was not "official" because the letter provided "that the sale [could not] be finalized without City Council approval." (*Id.*)

The Third Circuit rejected a virtually identical argument in *United States v. Bencivengo*, No. 13-1836, -- F.3d ---, 2014 WL 1613315 (3d Cir. March 6, 2014). The defendant there was a former mayor of a New Jersey township who agreed to influence a local school board election in exchange for a bribe. On appeal, the defendant argued there had been no violation of the Hobbs Act because he lacked "statutory power or authority over the School Board[,]" and had no "official role in choosing [its] members[.]" *Id.* at *2.  The court disagreed, holding that the Hobbs Act applied "where a public official has, and agrees to wield, *influence* over a governmental decision in exchange for financial gain," regardless of whether or not the official possessed "actual *de jure* or *de facto* power over" the decision. *Id.* at *6 (emphasis added).

7

*Bencivengo* forecloses Mack's challenge to his Hobbs Act and federal bribery convictions. Even assuming that Mack lacked unilateral authority to dispose of city property, he clearly exerted mayoral "influence" in the process. *Id.* Accordingly, Mack is not entitled to a judgment of acquittal.

### B.    Ralphiel Mack's Motion

Ralphiel Mack mounts a broader challenge to the sufficiency of the evidence against him. He argues that each of his convictions fail because the Government failed to prove his knowledge of the corrupt scheme.

Although proof of Ralphiel Mack's knowledge was by no means overwhelming, the Court concludes that it was sufficient to support the jury's verdict. As set forth above, the evidence supported an inference that Ralphiel had on more than one occasion collected Tony Mack's share of the bribe payments from Giorgianni and transported them to Tony Mack. Indeed, during the execution of the search warrant, FBI agents discovered Ralphiel in possession of $2,500 in marked bills. His role in the scheme, considered together with the consciousness of guilt evidence supplied through the testimony of Special Agent Doyle and Charles Hall, was sufficient to support the jury's conclusion that Ralphiel Mack "was more than a 'mere delivery boy.'" *United States v. Addonizio*, 451 F.2d 49, 74 (3d Cir. 1972).

### III.    Defendants' Rule 33 Motions

Under Rule 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Under this standard, the court is free to weigh the evidence and "exercise[] its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). "A court must grant a motion for a new trial when a reasonable possibility exists that 'a trial error had a substantial influence on the verdict.'" *United States v. Hamilton*, No. 05-876, 2010 WL 1027412, at *1 (D.N.J. March 18, 2010) (quoting

*Gov't of Virgin Is. v. Commissiong*, 706 F. Supp. 1172, 1184 (D.Vi. 1989)). However, "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if . . . 'there is a serious danger that a miscarriage of justice has occurred– that is, that an innocent person has been convicted.'" *Johnson*, 302 F.3d at 150 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). Rule 33 motions based on the weight of the evidence "are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (quoting *Gov't of Virgin Is. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

### A.     Burden Shifting

Defendants contend that the Government "subtly" shifted its burden of proof to the defense during its opening statement. (R. Mack Ltr. Br., ECF No. 184, 4-6.) Discussing audio recordings in which the Defendants used "code word[s]," the Government's counsel asked the jurors to

> pay careful attention to what the defendants say, but also pay careful attention to how they say things; pay careful attention to the questions they don't ask; and pay careful attention to what they demonstrate they understand by not asking those questions.

(1/9/14 Tr. 33.) According to Defendants, these statements were improper because they presented "a question that the Defense could not answer without putting the defendants on the stand." (R. Mack Ltr. Br., 4.)

The Court disagrees. Viewed in context, counsel's reference to the "questions [Defendants] don't ask" was meant to highlight the Defendants' failure to demand an explanation when, for instance, Giorgianni referred to "Uncle Remus" during telephone conversations. Counsel's statements were not, and could not plausibly be interpreted as, "a

comment on the failure of the accused to testify." *Brennan*, 326 F.3d at 187. As such, the Government made no attempt to shift its burden to the defense.

## B.    Prosecutorial Misconduct

During closing arguments, counsel for Tony Mack seized on what appeared to be a small, but potentially significant inconsistency in the Government's evidence. The Government in its rebuttal denied that the inconsistency existed. In doing so, counsel for the Government misrepresented some of the evidence underlying Tony Mack's position. Although Tony Mack did not object at the time, he now contends that the Government's error constituted "prosecutorial misconduct." (Mack Ltr. Br. 15-18.)

The apparent inconsistency occurred at the intersection of three pieces of evidence. The first was Manfredo's testimony that the entire transaction between Giorgianni and Mack on April 17, 2012 – from the time Mack entered the Steakhouse, until he walked back outside – lasted three minutes. (1/27/14 Tr. 113; 1/28/14 Tr. 48, 55.) The second piece of evidence was the surveillance camera footage of Mack's visit to the steakhouse that day. According to the timestamp, Mack entered the steakhouse at 1:28 p.m. (Govt. Exh. 2014-A.) Finally, Tony Mack's cell phone records showed that Mack had been on the phone between 1:28 and 1:33 p.m. (Govt. Exh. 702-B.)

Marshalling this evidence during his summation, Mack's attorney argued his client had been on the phone at the time Manfredo claimed he was accepting money from Giorgianni. (2/6/14 Tr. 64-65.) On rebuttal, the Government urged the jurors to disregard the phone records because Manfredo had testified that Mack met Giorgianni in the Steakhouse kitchen at 1:36 p.m. (2/6/14 Tr. 174.)

This apparently unintentional misstatement does not warrant a new trial. In suggesting otherwise, Tony Mack exaggerates the importance of the phone records. As counsel for the

Government pointed out at another point in his rebuttal, the timestamp reflected in the surveillance footage did not necessarily sync with the times reflected on the phone records. (2/6/14 Tr. 174-76.) The Court, moreover, instructed the jury that "[a]lthough the lawyers may have called your attention to certain facts or factual conclusions that they thought were important, what the lawyers said is not evidence and is not binding on you." (2/4/14 Tr. 9.) Under the circumstances, the Court is satisfied that the jurors heeded these instructions during their deliberations. *Cf. Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) (observing that "juries are presumed to follow their instructions") (internal quotation marks omitted).

### C.     Witness Credibility

Defendants maintain that untruthful testimony from the Government's cooperating witnesses tainted the jury's verdict. (T. Mack Ltr. Br. 18-20; R. Mack Ltr. Br. 8-12.) In support of this claim, the Defendants offer bald assertions of disbelief. For instance, Ralphiel Mack characterizes Manfredo's account of Tony Mack's April 17 visit to the Steakhouse as "so unlikely as to be brazenly false." (R. Mack. Ltr. Br. 11.) Tony Mack insists that "[b]elieving even a portion" of Hall's testimony "would fly in the face of reason." (T. Mack Ltr. Br. 19.)

There is no basis to disturb the jury's credibility determinations in this case. The Defense conducted lengthy cross-examinations of both Hall and Manfredo. During that time, Defendants explored issues related to the witnesses' cooperation agreements, probed their knowledge of the Government's investigation, and exposed their prior statements to investigators. As a result, the jury was fully equipped to evaluate the cooperating witnesses' credibility.

### D.     Issues Regarding Giorgianni's Statements

Giorgianni's surreptitiously recorded statements to FBI operatives featured prominently in the Government's case. Defendants did not object to the recordings at trial. However, they now claim that the Government's failure to call Giorgianni violated their Sixth Amendment right

11

to confrontation. (R. Mack Ltr. Br. 22.) This claim fails because Giorgianni's statements were "nontestimonial" for Sixth Amendment purposes. *Davis v. Washington*, 547 U.S. 819, 840 (2006).

The right to confrontation attaches only to out-of-court statements that are "testimonial," such as "testimony at a preliminary hearing, before a grand jury, or at a former trial." *United States v. Hendricks*, 395 F.3d 173, 182 (3d Cir. 2005) (quoting *Crawford v. Washington*, 541 U.S. 36, 50 (2004)). Confrontation rights may be implicated where "participants in a recorded conversation [are] aware that they are being recorded, and intentionally incriminate another individual." *United States v. Berrios*, 676 F.3d 118, 128 & n.5 (3d Cir. 2012). As a general rule, however, surreptitiously recorded conversations are insufficiently formal to trigger a defendant's confrontation rights. *Hendricks*, 395 F.3d at 181.

Ralphiel Mack suggests that Giorgianni's statements differed from conventional, nontestimonial coconspirator statements because Giorgianni, "aware of [the Government's] surveillance," purposely implicated Defendants in his scheme. (R. Mack Ltr. Br. 22.) This theory is wholly unsubstantiated. Accordingly Defendants had no Sixth Amendment right to cross-examine Giorgianni.

## IV.   Conclusion

For the reasons set forth above, and for other good cause shown, Defendants' Rule 29 and Rule 33 motions are denied. An appropriate order follows.

/s Michael A. Shipp
**Michael A. Shipp**
**United States District Judge**

**Dated:** May 16, 2014